Mary D. HAAS and John Mitchell, Individually, and on behalf of all other persons similarly situated, Appellants,

v.

**PITTSBURGH NATIONAL BANK et al.**

No. 74–2190.

United States Court of Appeals, Third Circuit.

Argued June 26, 1975.

Decided Sept. 25, 1975.

As Amended on Rehearing Dec. 29, 1975.

Daniel M. Berger, Michael P. Malakoff, Louise R. Malakoff, Berger & Kapetan, Pittsburgh, Pa., for appellants.

Alexander C. Sherrard, William M. Hoffman, Campbell, Thomas & Burke, Pittsburgh, Pa., for Pittsburgh Nat. Bank.

J. Tomlinson Fort, Edward W. Marsh, Thomas R. Wright, Reed Smith Shaw & McClay, Pittsburgh, Pa., for Mellon Bank, N. A.

Donald C. Bush, B. Herbert Boatner, Jr., Anderson, Moreland & Bush, Pittsburgh, Pa., for Equibank, N. A.

Before KALODNER, VAN DUSEN and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal presents novel issues of great importance to credit cardholders and the banking industry in Pennsylvania. Plaintiffs challenge the method by which three national banks computed the service charge on their customers' Master Charge and BankAmericard revolving charge accounts prior to the institution of this class action. At issue are

the maximum lawful rate of service charge and the "previous balance" method of determining the balance on which the service charge is imposed.

Plaintiff Haas instituted suit on November 13, 1972, against Pittsburgh National Bank, Mellon Bank, and Equibank. She sought statutory damages under the National Bank Act in an amount double the interest received by defendants from their cardholders during the preceding two years. 12 U.S.C. §§ 85–86 (1970). The complaint alleged that defendants charged interest at a rate in excess of that permitted by Pennsylvania law which the National Bank Act makes applicable to national banks. *See id.* § 85 (1970).

On August 6, 1973, the United States District Court for the Western District of Pennsylvania entered an order defining the class as "[a]ll holders of . . . credit cards issued by defendants, Pittsburgh National Bank, Mellon Bank, N.A. and Equibank, N.A., who, during the period since November 13, 1970, were charged by such defendants a finance charge in connection with the purchase of goods or services." Subsequently, on January 21, 1974, the district court determined that Haas could not represent cardholders at Equibank since she only held cards issued by the other two defendants. The district court therefore directed that, within thirty days, a nominal plaintiff be added who held a card issued by Equibank. The complaint accordingly was amended on February 19, 1974, to add plaintiff Mitchell.

Before this court's recent opinion in *Acker v. Provident National Bank*[1] was filed, the district court granted the defendants' motion for summary judgment. The district court held:

(1) Bank-operated credit card plans involving the purchase of goods and services are governed by the Pennsylvania Goods and Services Installment Sales Act (Sales Act) which specifies that a service charge of one and one-quarter percent per month may be made. 69 P.S. § 1101 *et seq.* (Supp. 1975–1976). Such plans are not regulated under the Pennsylvania Banking Code of 1965 which limits interest to one percent per month. 7 P.S. § 309 (1967).

(2) The Sales Act permits the "previous balance" method to be used in computing the balance upon which a service charge is imposed.

(3) Unpaid service charges may be included in the balance subject to subsequent service charges, thus permitting the compounding of interest.

Summary judgment was granted in favor of Equibank on the previous balance method issue on the ground that the amendment adding plaintiff Mitchell did not relate back to the filing of the original complaint. Thus, since Equibank ceased this practice more than two years before the date of the order directing that an additional plaintiff be joined, the district court held that the action against Equibank was barred by the statute of limitations.

Plaintiffs appeal from the judgment entered in the district court. They do not contest the district court's holding that banks may charge one and one-quarter percent interest on purchases governed by the Sales Act. We reverse, however, as to other issues.

### I. Background

A person desiring to establish a Master Charge or BankAmericard revolving charge account completes a credit application form containing the terms of the account agreement. This application then is reviewed by the bank to which it is submitted. If the application is approved, a Master Charge or BankAmericard card is issued. Under the account agreements in use at the defendant banks, the cardholder may present this card to purchase merchandise from merchants who have agreed to honor the

1. 512 F.2d 729 (3d Cir. 1975).

credit card.[2] The merchant imprints a sales draft describing the merchandise with the cardholder's number and gives the cardholder a copy. The merchant then submits the sales draft to the bank which issued the credit card, and the bank in turn pays the merchant the face amount of the sales draft, less an agreed discount. The cardholder's purchase is posted to his revolving charge account.

The balance in the cardholder's account is computed on the basis of monthly billing cycles. On the last day of the billing cycle, the "billing date," the bank's computer reviews all transactions posted to the cardholder's account during the billing cycle. The computer then calculates the service charge, if any, and prints out a monthly statement which is mailed to the cardholder. This statement shows, *inter alia*, the balance owing at the beginning of the billing cycle, all purchases and payments made during the billing cycle, the service charge, and the balance owing at the end of the cycle.

## II. *Service Charge on Commercial Transactions*

■ Plaintiffs contended in the district court that a bank operating a credit card plan may not charge more than one percent interest per month on the balance outstanding in a cardholder's account. This contention was based on plaintiffs' assertion that the interest rate on balances derived on all credit card transactions is governed by section 309 of the Banking Code of 1965. 7 P.S. § 309 (1967). After the district court had granted summary judgment in favor of defendant banks, however, this court ruled that, with respect to transactions covered by the Sales Act, banks as well as merchants may impose a monthly service charge of one and one-quarter percent. *Acker v. Provident National Bank, supra*, 512 F.2d at 739.

In light of this intervening decision, plaintiffs have modified their contention on appeal. Plaintiffs recognize that, under *Acker*, a bank may charge the one and one-quarter percent rate on "consumer" transactions regulated by the Sales Act. Consumer transactions comprise purchases of goods "for use primarily for personal, family, or household purposes" and purchases of services "for other than a commercial or business use." 69 P.S. § 1201(1), (2) (Supp.1975–1976); *see Butera v. Atlantic Richfield Co.*, 63 Pa.D. & C.2d 232, 234 (Pa.Ct. Common Pleas 1973). However, although plaintiffs agree that *Acker* requires rejection of their argument with respect to consumer transactions, they still contend that interest rates on "commercial" transactions, *i. e.*, purchases of goods and services for business purposes, are regulated by the Banking Code.

■ Defendants have objected on appeal that nominal plaintiffs Haas and Mitchell lack standing to challenge the interest rate charged on commercial transactions since the record does not demonstrate the nature of their purchases. Defendants contend that all transactions by nominal plaintiffs were consumer transactions and that the nature of these transactions is not a genuine issue of fact in dispute. *See* Fed.R.Civ.P. 56. As we shall explain shortly, we agree that all transactions by nominal plaintiff Haas involving Mellon Bank were consumer transactions. We nonetheless believe summary judgment in favor of Mellon Bank was inappropriate since the district court has not yet determined, in the exercise of its discretion, whether Haas may represent a class of Mellon Bank cardholders who were charged interest on commercial transactions. With respect to Pittsburgh National Bank and Equibank, we reverse the summary judgments entered because we are unable to find any basis in the record for a determination that nominal plaintiffs Haas and Mitchell were not charged interest on commercial transactions.

---

2. The cardholder also may utilize his card to borrow money through occasional advances.

This aspect of the defendant's credit plan is not challenged by plaintiff.

A. *Haas as Class Representative for Mellon Bank Cardholders Paying Interest on Commercial Transactions*

During the two-year period under consideration, the balance of Haas, the only nominal plaintiff holding a Mellon Bank Master Charge card, was attributable to only one transaction. On August 3, 1970, Haas purchased a hearing aid for $300. We are persuaded that, as a matter of law, this was a consumer transaction since, under the Sales Act, a hearing aid is an item "bought for use primarily for personal . . . purposes." 69 P.S. § 1201(1) (Supp.1975–1976). Because Haas did not engage in any commercial transactions, she does not have standing against Mellon Bank on this issue.

Even though Haas herself does not have standing to challenge the service charge rate imposed on commercial transactions by Mellon Bank, summary judgment is inappropriate if Haas may represent a class of plaintiffs who do have standing. Rule 23(a) of the Federal Rules of Civil Procedure specifies four prerequisites to the maintenance of a class action. In determining the propriety of permitting Haas to represent cardholders who have been charged interest by Mellon Bank on commercial transactions, the third and fourth prerequisites are most in point:

> Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if . . . (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

In *La Mar v. H & B Novelty & Loan Co.*, the Ninth Circuit held that a nominal plaintiff with a claim against one defendant could not represent class plaintiffs with claims against another defendant. 489 F.2d 461 (9th Cir. 1973). The court determined that, as a matter of law, the nominal plaintiff was not "typical" since

> typicality is lacking when the representative plaintiff's cause of action is against a defendant unrelated to the defendants against whom the cause of action of the members of the class lies.

*Id.* at 465. In addition, the court determined that,

> [i]n keeping with [the tone of the Advisory Committee's Note] and to reduce the incidence of proceedings in which the trial judge and the representative plaintiff's counsel become a parttime regulatory agency, we assert that a plaintiff who has no cause of action against the defendant can not "fairly and adequately protect the interests" of those who do have such causes of action. This is true even though the plaintiff may have suffered an identical injury at the hands of a party other than the defendant and even though his attorney is excellent in every material respect.[3]

*Id.* at 466.

We believe the situation in *La Mar* is distinguishable from that in the present case. Whereas in *La Mar* the representative plaintiffs asserted no cause of action against the dismissed defendants, here Haas had claims against Mellon Bank for other violations of the National Bank Act. She alleged that Mellon Bank unlawfully handled her revolving account by using the previous balance method and by compounding service charges.

Haas' two claims against Mellon Bank, moreover, are closely related to the commercial transactions claim on which she

---

**3.** The court continued:

> Obviously this position does not embrace situations in which all injuries are the result of a conspiracy or concerted schemes between the defendants at whose hands the class suffered injury. Nor is it intended to apply in instances in which all defendants are juridically related in a manner that suggests a single resolution of the dispute would be expeditious.

> 489 F.2d at 466 (footnotes omitted).

lacks standing. Not only do all three claims involve identical revolving accounts under the same Mellon Bank cardholder agreements, but the statutory damages sought to be recovered for each asserted violation are in large part the same. The National Bank Act provides that a person who pays an unlawfully high rate of interest may recover twice the amount of interest, lawful and unlawful, paid to the bank. 12 U.S.C. § 86 (1970); *see Lake Benton First Nat'l Bank v. Watt*, 184 U.S. 151, 22 S.Ct. 457, 46 L.Ed. 475 (1902). Thus, under our holding today, the class of Mellon Bank cardholders which Haas may represent is entitled to recover twice all service charges paid which were computed on balances containing unpaid service charges on balances determined using the previous balance method. Because Mellon Bank discontinued use of the previous balance method in February 1972 and ceased compounding in July 1972, the last payments of allegedly usurious interest probably were made sometime thereafter. Thus, the class as a whole may recover statutory damages attributable to payments made during almost the entire damage period.

 The damages sought for collection of interest above one percent per month on commercial transactions also would be attributable to payments over the entire damage period. However, each member of the class of Mellon Bank cardholders who, in any month, paid a service charge which was in violation both of the rate limit on commercial transactions and of either the rule against compounding or the prohibition against use of the previous balance method, would recover only one statutory penalty equal to twice the service charge paid. The class member is not entitled to more than one statutory penalty because the service charge was unlawful for more than one reason. As a consequence, to the extent that class members paid service charges which exceeded the alleged one percent limit on commercial transactions and, at the same time, were unlawful as compounded or calculated using the previous

balance method, the damages sought to be recovered are identical.

The distinctions we have outlined between this case and *La Mar* persuade us that a different disposition of this case is appropriate. Generally, the question whether a class action fulfills the prerequisites enumerated in Rule 23(a) is committed to the broad discretion of the district court. *Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239, 245 (3d Cir. 1975); *City of New York v. International Pipe & Ceramics Corp.*, 410 F.2d 295, 298 (2d Cir. 1969). We believe that, in the situation manifested by the present record, the determination whether Haas may represent a class of Mellon Bank cardholders charged more than one percent on commercial transactions should be entrusted to the discretion of the district court in the first instance. We cannot say, as did the court in *La Mar*, that permitting such representative status would be, on the present record, an abuse of the district court's discretion.

We make only one additional observation. If the district court determines that Haas is not a proper class representative, and if, on motion, the district court permits plaintiffs to add a nominal plaintiff who was charged interest by Mellon Bank on commercial balances, the question whether the statute of limitations was tolled as of the date the action initially was filed will be presented. *See American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974).

B. *Merits of Commercial Transactions Issue*

 The record presently contains no indication that either of the nominal plaintiffs has paid interest on commercial balances at any of the defendant banks. Thus, we are satisfied that, at this point, any ruling would be premature on the issue whether a national bank in Pennsylvania may charge more than one percent interest on commercial transactions. If the district court determines that none of the nominal plaintiffs may represent a class of cardholders who

paid interest on commercial balances, and if no additional nominal plaintiffs are joined, this issue will drop from the case. We believe that an issue as complex as this should be decided on a more complete record and with the benefit of a district court's analysis.

### III. Previous Balance Method

Plaintiffs contend that the previous balance method of determining the balance on which a service charge is imposed is contrary to the provisions of the Sales Act.[4] When the Sales Act was adopted in 1966, the previous balance method was the method most commonly used by both large and small retail merchants in Pennsylvania. Defendants Mellon Bank and Pittsburgh National Bank used this method until February and November of 1972, respectively. Defendant Equibank discontinued use of the previous balance method on May 31, 1971.[5] The previous balance method still is employed by many retailers, including a major department store in Pittsburgh. We must determine whether the Pennsylvania legislature, in enacting the Sales Act, intended to proscribe continued use of the previous balance method.

### A. Operation of the Previous Balance Method

Under the previous balance method, the balance on which the service charge is computed is the balance outstanding on the first day of the billing cycle. This balance is the same as that outstanding on the last day of the previous billing cycle. Purchases, payments, and credits occurring during the billing cycle are not taken into account unless the entire balance outstanding at the close of the previous billing cycle is discharged. If the previous balance is fully offset by payments and credits posted during the billing cycle, no service charge is imposed for that billing cycle.

The manner in which the previous balance method operates is most effectively described by example. Assume that a cardholder's billing date is the thirtieth of each month and that on March 30 the balance in the cardholder's account is zero. If the cardholder purchases $100 worth of merchandise on April 25, that purchase will appear on the cardholder's April 30 statement but will not be included in the balance on which the service charge for the month of April is calculated. The April service charge will be one and one-quarter percent of zero, or zero. The five days' use of the $100 is called the "free ride" since no service charge is imposed. If the purchase had been made on April 5, the "free ride" would have been for 25 days.

In the example, the balance outstanding on April 30 is $100. This balance is also the balance on the first day of the May billing cycle and, therefore, is the balance on which the May service charge will be imposed unless the balance is fully discharged before the end of the May billing cycle. Thus, if the cardholder pays $75 on account on May 5 and no other transactions occur during May, the service charge for the May billing cycle will be one and one-quarter percent of $100, the previous balance, or $1.25. The service charge for May is computed in this manner even though $100 was outstanding during only five days and the cardholder had the use of only $25 during the rest of the May billing cycle. The actual rate of service charge for May thus is much higher than the nominal rate of one and one-quarter percent specified in the Sales Act. Of course, if the cardholder had discharged his entire

---

**4.** Plaintiffs do not challenge on appeal the use of the previous balance method in computing balances resulting from commercial transactions not covered by the Sales Act.

**5.** Summary judgment was granted in favor of Equibank on the ground that it ceased computing balances according to the previous balance method more than two years before the district court ordered that a nominal plaintiff with a revolving charge account at Equibank be added. As indicated later in our opinion, we conclude that this claim against Equibank was barred by the statute of limitations if no class member *paid* interest calculated using the previous balance method on or after August 6, 1971.

previous balance during May, no service charge at all would have been imposed in connection with the April 25 purchase.

## B. *Other Methods*

At least three methods other than the previous balance method may be available to banks and merchants in computing the monthly service charge. All three of the defendant banks now use a variant of the average daily balance method. Under the "true" average daily balance method, the sum of all actual daily balances in the cardholder's account during the billing cycle is divided by the number of days in the cycle. The resulting quotient is the average daily balance upon which the service charge is imposed. The variant presently utilized by defendants is known as the "hybrid" average daily balance method. The "hybrid" method differs from the "true" method only in that purchases during the current billing cycle are not included in the daily balances. The cardholder, as under the previous balance method, gets a "free ride" until the first day of the new billing cycle, at which time the previous month's purchases are added into the balance. Use of both the "true" and "hybrid" methods may be impractical for smaller merchants who are unable to afford computer time.

A third method of accounting is the adjusted balance method, which is no more difficult to employ than the previous balance method and is the method most favorable to the cardholder. Under the adjusted balance method, all payments and other credits posted to the cardholder's accounts during the billing cycle are subtracted from the balance outstanding at the beginning of the cycle. Purchases during the current billing cycle are not taken into account. The resulting figure is the balance upon which the service charge is computed. Purchases then are added in to arrive at the beginning balance for the next billing cycle.

Another possibility is the ending balance method. This method takes into account payments and other credits as well as purchases in calculating the balance upon which the service charge is imposed. Thus, if purchases exceed credits during the billing cycle, the cardholder is charged a full month's service charge on the difference which may be outstanding for only a few days.

## C. *Legality of the Previous Balance Method*

Sections 904 and 905 are the provisions of the Sales Act which plaintiffs contend proscribe use of the previous balance method. 69 P.S. §§ 1904–05 (Supp.1975–1976). Section 904, the substantive usury provision,[6] states that the service charge shall not exceed certain rates "computed on the outstanding balances from month to month." On all but rather small balances, the maximum rate of service charge permitted by section 904 is one and one-quarter percent per month "on the outstanding balance."

■■ We are unable to discern in the language of section 904, standing alone, an intent to outlaw the previous balance method. We disagree with plaintiffs' contention that section 904 unambigu-

---

**6.** Section 904 provides:

Subject to the other provisions of this article the seller or holder of a retail installment account may charge, receive and collect the service charge authorized by this act. The service charge shall not exceed the following rates computed on the outstanding balances from month to month:

(a) On the outstanding balance, one and one-quarter percent (1¼%) per month.

(b) A minimum service charge of seventy cents (70¢) per month may be made for each month if the service charge computed is less than that amount; such minimum service charge may be imposed for a minimum period of six months.

(c) The service charge may be computed on a schedule of fixed amounts if as so computed it is applied to all amounts of outstanding balances equal to the fixed amount minus a differential of not more than five dollars ($5), provided that it is also applied to all amounts of outstanding balances equal to the fixed amounts plus at least the same differential.

69 P.S. § 1904 (Supp.1975–1976).

ously provides that the "outstanding balances from month to month" must be struck at the end of the monthly billing cycle. Thus, were section 904 the only authority for plaintiffs' position, we would not conclude that the legislature intended to prohibit continued use of so prevalent a practice as the previous balance method. We believe, however, that the language and legislative history of section 905 clarifies the intent behind section 904 and compels us to hold that the previous balance method is proscribed by the Sales Act.

Section 905 is a disclosure provision which requires the operator of a credit card plan to send an explanatory statement to its cardholders once a month.

This Section provides:

The seller or holder of a retail installment account shall promptly provide the buyer with a statement as of the end of each monthly period (which need not be a calendar month) setting forth the following:

(a) The balance due to the seller or holder from the buyer at the beginning of the monthly period.

(b) The dollar amount of each purchase by the buyer during the monthly period and, (unless a sales slip or memorandum of each purchase has previously been furnished the buyer or is attached to the statement) the purchase or posting date, a brief description and the cash price of each purchase.

(c) The payments made by the buyer to the seller or holder and any other credits to the buyer during the monthly period.

(d) The amount of the service charge, and the following statement: The service charge herein contained does not exceed the equivalent of fif-

teen percent (15%) simple interest per annum on the unpaid balance except that a minimum service charge of seventy cents (70¢) per month may be made.

(e) The total balance in the account at the end of the monthly period.

(f) A legend to the effect 'that the buyer may at any time pay his total balance.

The items need not be stated in the sequence or order set forth above; additional items may be included to explain the computations made in determining the amount to be paid by the buyer.

69 P.S. § 1905 (Supp.1975–1976).

We believe a careful examination of this provision offers considerable illumination in interpreting section 904. Because the legislature clearly intended the statement required by section 905 accurately to disclose the import of section 904, we must construe these companion provisions consistently with one another.

Under the disclosure provisions, a statement must be sent to the buyer "as of the end of each monthly period." This statement must disclose (a) the balance due at the beginning of the monthly period, (b) the amount of purchases during the month, (c) payments and credits on behalf of the buyer during the monthly period, and (d) the amount of the service charge computed on the "unpaid balance." What the legislature intended was a calculation commencing with the balance "at the beginning of a monthly period." The amount of the new balance will depend on how the charges, payments, and credits are treated in the computation of that balance, but the service charge is not to exceed the equivalent of fifteen percent simple interest per annum on the unpaid balance [7] at the end of that monthly period.

---

**7.** Section 201(11) of the Sales Act, 69 P.S. § 1201(11), defines "unpaid balance" to mean "the cash sale price of the goods or services which are the subject matter of the retail installment sale, plus the amounts, if any, included in a retail installment sale for insurance and official fees, minus the amount of the buy-

er's down payment in money or goods." This definition by its terms obviously does not apply to revolving accounts; it only deals with specific retail sales on an installment basis.

The "total balance" of subsections (e) and (f) would include service charges added to the "unpaid balance."

That the calculation of the service charge is to be predicated upon the new balance at the end of the month is indicated by the requirement that the statement be rendered "as of the end of each monthly period" and that the statement include the total balance "at the end of the monthly period." We believe that the foregoing is inconsistent with the use of the previous balance method.

The legislative history of section 905 supports this interpretation. The original House-passed version of the Sales Act did not contain the language "as of the end of each monthly period." Rather, it required that a statement be sent to the cardholder "as of the beginning or end of each period at the end of which there is any unpaid balance . . . ." *See* Printers No. 24, § 502(a). This requirement reflected the previous balance method. The original House-passed version provided for disclosure of (1) purchases, (2) the unpaid balance under the agreement at the beginning and end of the period, (3) payments and other credits, (4) insurance premiums, (5) the service charge, and (6) the percentage rate the service charge "bears to the outstanding principal balance on which it is computed." The items to be disclosed under Printers No. 24 are not expressed in the order finally adopted by the legislature.

The disclosure section of the first Senate reprint was substantially the same as the enacted version. *See* Printers No. 32, § 905. The order of the items subject to disclosure was the same as in the Sales Act and the language "as of the end of each monthly period" was included. In addition, the words "under the agreement" were deleted, indicating that the legislature did not intend to leave the method of computation of balances entirely to agreement. Subsection (d), however, merely mandated disclosure of "the amount of the service charge." The term "unpaid balance" was not used and the legend pertaining to the interest rate in enacted subsection (d) was not required.

Section 905 of the bill which emerged from conference was identical to the enacted version. Although we have not found any explanation of the metamorphosis of section 905, we recognize a pattern of greater and greater precision in determining both the rate of service charge and the balance on which it may be calculated. The original House-passed bill left the method of interest computation almost entirely up to agreements dominated by retailers and banks. The enacted version more narrowly restricts the permissible methods.

Defendants rely upon decisions in other jurisdictions[8] and particularly upon *Seibert v. Sears, Roebuck & Co.* which interpreted the California Retail Installment Sales Act, commonly known as the Unruh Act. 45 Cal.App.3d 1, 120 Cal. Rptr. 233 (1975); Cal.Civ.Code § 1801 *et seq.* The court in *Seibert* held that the previous balance method was permissible under the Unruh Act. The California statute, however, is quite different from the Pennsylvania Sales Act. The Unruh

---

**8.** *Federated Dep't Stores, Inc. v. Pasco,* 275 So.2d 46 (Fla.Dist.Ct.App.1973), *construing* Retail Installment Sales Act, 31 Fla.Stat.Ann. § 520.30 *et seq.; Johnson v. Sears Roebuck & Co.,* 14 Ill.App.3d 838, 303 N.E.2d 627 (1973), *construing* Retail Installment Sales Act, Ill. Ann.Stat. ch. 121½, § 501 *et seq.* (Smith-Hurd Supp.1974); *Zachary v. R. H. Macy & Co.,* 31 N.Y.2d 443, 293 N.E.2d 80, 340 N.Y.S.2d 908 (1972), *construing* Retail Installment Sales Act, N.Y. Pers. Prop.Law § 401· *et seq.* (McKinney 1962 & Supp.1974–1975). The foregoing cases are not helpful because the pertinent provisions of the statutes they construe differ greatly from the corresponding provisions in the Pennsylvania Sales Act.

In support of their contention that the previous balance method is unlawful, plaintiffs also cite decisions in other jurisdictions. *Partian v. First Nat'l Bank,* 467 F.2d 167 (5th Cir. 1972); *Grigg v. Robinson Furniture Co.,* C.C.H. Consumer Credit Guide ¶ 98,848, at 88,529 (Mich. Cir.Ct. March 13, 1974) (Leave to appeal granted in Mich.Ct.App.); *Montgomery Ward & Co. v. O'Neil,* C.C.H. Consumer Credit Guide ¶ 99,535, at 98,487 (Minn.Dist.Ct. April 1, 1971) (vacated). We find these cases likewise of little assistance.

Act requires that, before the first transaction, the seller notify the buyer of the "method of determining the balance upon which a finance charge may be imposed." Cal.Civ.Code § 1810.1. A substantive provision then limits the finance charge to certain percentages "computed on the outstanding balances from month to month." *Id.* § 1810.2. The disclosure section uses the term "previous balance" and further specifies that the seller must disclose

> (6) The balance on which the finance charge was computed, and a statement of how that balance was determined. If any balance is determined without first deducting all credits during the billing cycle, that fact and the amount of such credits shall also be disclosed.

*Id.* § 1810.3(a).

In view of these significant differences between the Pennsylvania and California statutes, the analogy which the defendants seek to draw is not persuasive.

### IV. Compound Interest

■ This court held in *Acker* that Pennsylvania "disfavors compound interest and allows its imposition only where there is an express statutory authorization or a specific contract provision so providing." 512 F.2d at 739 (footnotes omitted). We further held that the Sales Act is not such an express statutory authorization. *Id.* Thus, unless defendant banks'. cardholder agreements effective during the two-year damage period[9] specifically permitted the compounding of interest, defendant's practice of computing service charges on balances including unpaid service charges was unlawful.[10]

All three defendants computed service charges on previously imposed service charges during at least part of the period under consideration in this case. The record reflects that Pittsburgh National Bank compounded service charges throughout the period. Mellon Bank discontinued compounding in July 1972, while Equibank engaged in this practice only between June 1, 1971, and December 31, 1971. Apparently, none of the banks compounded interest on cash advances.

■ We have examined with care the cardholder agreements in effect at Pittsburgh National Bank,[11] Mellon Bank,[12]

**9.** November 13, 1970, to November 13, 1972, as to Mellon Bank and Pittsburgh National Bank; August 6, 1971, to August 6, 1973, as to Equibank.

**10.** This panel may not overrule a decision of a prior panel. *In re Central R. R.,* 485 F.2d 208, 210–11 (3d Cir. 1973); *cf.* 3d Cir. Internal Operating Procedures, Introduction (Mar. 1, 1974).

**11.** The relevant portions of the Pittsburgh National Bank agreements are:

> October 1968 revision:
> Service charges for merchandise or services or recurring charges shall be computed and charged monthly on said items comprising the previous balance, which was the "current balance" outstanding on the immediately preceding statement date, less charge cash advanced during the preceding month and the service charge on such charge cash.
> January 1971 revision:
> Finance charges for merchandise, services, and recurring charges shall be computed and charged monthly on said items comprising the "Merchandise Previous Balance," which was the "Merchandise New Balance" out-

> standing on the immediately preceding statement date, without deducting payments and credits during the billing cycle. .
> November 1972 revision:
> Customer also agrees to pay a Finance Charge . . . on amounts advanced by Bank on account of sales drafts and Recurring Charges of Merchandise and Services, as follows: As to Merchandise and Services, there will be no Finance Charge on current advances for the first month after billing. A Finance Charge will be imposed on the average daily balance of Merchandise and Services for which the one-month free period has expired . . . .. The said average daily balance is the sum of the daily closing balances of expired free period Merchandise and Services in customer's account during the Billing Cycle divided by 30.

**12.** The relevant portions of the Mellon Bank agreements are:

> October 1970 revision (the October 1971 revision, not quoted here, is not significantly different from the October 1970 revision):
> Cardholder shall pay Bank the total amount of such charges in monthly installments

and Equibank[13] during the damage period. Nowhere in these agreements do we find specific provisions permitting the bank to collect compound interest. In the absence of such provisions, we must conclude that, under *Acker,* the practice of compounding service charges in which all three defendants engage was unlawful.

### V. The Tolling of the Statute of Limitations

A final issue presented for our consideration is whether the commencement of the original class suit by plaintiff Haas tolled the running of the statute of limitations as to plaintiff Mitchell and other Equibank cardholders.

Neither in her initial complaint, filed in November 13, 1972, nor in an amended complaint filed shortly thereafter, did Haas allege standing with respect to Equibank. Consequently, Equibank moved to dismiss for failure to state a cause of action against it. On August 6, 1973, the district court denied Equibank's motion, and, in response to Haas' motion for class determination, granted Haas class representative status as to all three defendant banks. The court determined that, even though Haas lacked standing because she did not have a revolving credit card account with Equibank, the class action could nevertheless be maintained against Equibank.[14]

After the district court entered its order certifying the class action, the Supreme Court rendered its opinion in *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), and the Ninth Circuit decided *La Mar v. H & B Novelty & Loan Company,* 489 F.2d 461 (9th Cir. 1973). In light of these two decisions, the district court determined that its certification order was improper as to Equibank. Therefore, on January 21, 1974, it ordered that summary judgment be entered in favor of Equibank unless a nominal plaintiff was added who held or had held a Master Charge card issued by Equibank within the last two years. Pursuant to this order, the complaint was amended on February 19, 1974, to add plaintiff Mitchell. We believe that, where no nominal plaintiff has standing on any issue against one of multiple defendants, a suit for damages may not be maintained as a class action against that defendant.[15] The district

---

equal to 5% or such total amount of $10, whichever is greater. Cardholder shall also pay bank . . . a finance charge at the rate of $1\frac{1}{4}\%$ per month computed on the outstanding balances from month to month. January 1972 revision:

The "purchase balance subject to finance charge" is determined by subtracting from the total previous balance for purchases . . . payments as received and other credits as made during the billing cycle, and then dividing the sum of the daily outstanding balances by 30.

After July 1972 Mellon no longer compounded service charges. Only purchase by Haas using Mellon Master Charge card was hearing aid before or during damage period. That was August 1970. Next use was June 1973.

13. The relevant portions of the Equibank agreements are:

August 1969 to May 1971 revisions (three agreements in which the quoted language is identical):

Cardholders agree: . . . to pay . . . a Finance Charge at the rate of $1\frac{1}{4}\%$ per month on the previous balance (without deducting payments made or credits granted during the billing cycle) for credit extended for purchases of merchandise and services. May 1971 revision:

Cardholder agrees: . . . to pay . . . a Finance Charge at the rate of $1\frac{1}{4}\%$ per month (which corresponds to an Annual Percentage Rate of 15%) on the average daily balance of credit extended for purchases of merchandise and services.

14. *Haas v. Pittsburgh National Bank,* 60 F.R.D. 604 (W.D.Pa.1973). Equibank formerly was known as Western Pennsylvania National Bank and is so denominated in the district court's August 6, 1973 opinion.

15. The court in *La Mar v. H & B Novelty & Loan Company, supra,* noted that there may be certain exceptions to this rule. The court properly excluded (1) situations in which the injuries are the result of "a conspiracy or concerted schemes between the defendants at whose hands the class suffered injury," or (2) instances in which all defendants are juridically related and a single disposition of the entire dispute would be expeditious. 489 F.2d at 466.

court, therefore, properly ordered the entry of summary judgment in favor of Equibank unless an appropriate nominal plaintiff was added.

On cross-motions for summary judgment, the district court held that the two-year statute of limitations was tolled as to Equibank[16] on January 21, 1974. The district court therefore determined that the previous balance method claim against Equibank was time-barred since Equibank had discontinued this practice before January 21, 1972. Although the district court did not expressly so rule, its holding concerning the date on which the statute of limitations was tolled would lead to the conclusion that the compound interest claim against Equibank also was barred.[17]

 On appeal, plaintiffs do not contest the district court's holding that Haas could not represent the class of Equibank cardholders,[18] but rather argue that when Haas filed the original class action complaint on November 13, 1972, the limitations period was tolled for all members of the class Haas purported to represent. Plaintiffs further argue that since Mitchell was timely added after the district court determined that the class of Equibank cardholders could not be represented by Haas, the amendment which added Mitchell "relates back" to the initial filing of the complaint, November 13, 1972, and therefore plaintiffs'

claims against Equibank are not time-barred inasmuch as Equibank had not, as of that date, discontinued use of the challenged accounting practices.

Plaintiffs rely on *American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), as support for their contention that the amendment of the complaint relates back to the original filing and that their claims against Equibank, therefore, are not barred by the statute of limitations. In *American Pipe,* the State of Utah filed a class action for treble damages under the federal anti-trust laws, purporting to represent public bodies and agencies in Utah which had been end users of pipe acquired from defendants. The district court subsequently determined that the suit could not be maintained as a class action because of plaintiffs' failure to satisfy the numerosity requirement under Rule 23(a)(1) of the Federal Rules of Civil Procedure. Shortly thereafter, more than 60 parties, all of whom had been claimed as members of the original class, filed motions to intervene as plaintiffs in the state's action. The district court denied the motions on the ground that the limitations period had run as to them and had not been tolled by the institution of the class action in their behalf. The Court of Appeals for the Ninth Circuit reversed and the Supreme Court affirmed, holding that

**16.** With respect to the Mellon Bank and Pittsburgh National Bank, November 13, 1970, was the determinative date for purposes of the National Bank Act's two-year statute of limitations.

**17.** Since the record does not indicate otherwise, we assume that Equibank continues to impose more than one percent interest per month on commercial balances.

**18.** It is well settled that a class action may not be maintained unless the plaintiff representative is a member of the class he purports to represent. *See, e. g., Sosna v. Iowa,* 419 U.S. 393, 403, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); *Bailey v. Patterson,* 369 U.S. 31, 32–33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); 3B Moore's Federal Practice ¶ 23.04 at 253–254. An extension of this rule has recently evolved as a result of class actions frequently being institut-

ed by a plaintiff against multiple defendants, not all of whom had dealings with the class representative but who at least engaged in conduct closely similar to that of the defendant(s) against whom the nominal plaintiff has a cause of action. Whether for reasons of lack of standing, *Weiner v. Bank of King of Prussia,* 358 F.Supp. 684 (E.D.Pa.1973), or for lack of Rule 23(a)(3) typicality, *La Mar v. H & B Novelty & Loan Company,* 489 F.2d 461 (9th Cir. 1973), it has been held that a nominal plaintiff may not maintain an action on behalf of a class against a specific defendant if the plaintiff is unable to assert an individual cause of action against that defendant. *See also Kauffman v. Dreyfus Fund, Inc.,* 434 F.2d 727 (3d Cir. 1970), *cert. denied,* 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971); *Leonard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 64 F.R.D. 432, 434–35 (S.D.N.Y.1974).

at least where class action status has been denied solely because of failure to demonstrate that "the class is so numerous that joinder of all members is impracticable," the commencement of the original class suit tolls the running of the statute [of limitations] for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status.

414 U.S. at 552–53, 94 S.Ct. at 766, quoting Fed.R.Civ.P. 23(a)(1).

Thus, *American Pipe* holds that the timely commencement of a class action tolls the applicable statute of limitations, even though the suit is later denied class action status after the statutory period has elapsed. Stressing the policy of "efficiency and economy of litigation which is a principal purpose" of Rule 23 class actions, 414 U.S. at 553, 94 S.Ct. at 766, the Court declared that the same standard applied to those class members who did not rely on the filing of the action as to those who did rely. The Court was concerned that, if the statute of limitations is not tolled in situations where the district court's ruling on maintenance of a class action is difficult to predict, members of a purported class might be induced to intervene as a matter of self-protection. Such protective intervention by class members might be compelled because those class members who have not intervened by the time the untolled statute of limitations runs would be unable to seek relief individually. The Court therefore reasoned that a rule which would result in the individual interven-

tion of class members and which would "breed" needless duplicative motions was not in keeping with the objectives of the federal class action procedures.[19]

Although the Court in *American Pipe* dealt with a situation where the basis for the district court's rejection of the class action was the failure to satisfy the numerosity requirement of Rule 23, we believe the broad tolling principle it enunciated should also apply to the instant case where the district court determined after its original certification[20] of the class action that Haas could not represent cardholders at Equibank since she did not hold a card issued by it. Haas' timely action against all three banks provided Equibank with notice within the statutory period of the substantial nature of the claims against which they would be required to defend and also "the number and generic identities of the potential plaintiffs." These plaintiffs were in existence at the time the action was originally brought and were described as claimants in the complaint. The only change effectuated by the district court's order was the prompt addition of a nominal plaintiff who held an Equibank card.

The Court in *American Pipe* was also convinced that, to be most consistent with the federal class action procedure, the rule must be that "the commencement of a class action suspends the applicable statute of limitations as to all *asserted members of the class who would have been parties had the suit been permitted to continue as a class action.*" 414 U.S. at 554, 94 S.Ct. at 766

**19.** The Court in *American Pipe* also carefully considered whether its rule was inconsistent with the policies behind the statute of limitations. It concluded that the essential fairness to the defendants and the barring of a plaintiff's stale claims were satisfied by the rule since the commencement of a suit provides notice to the defendants within the statutory period of the claims against which they will be compelled to defend as well as the "number and generic identities of the potential plaintiffs . . . .." 414 U.S. at 555, 94 S.Ct. at 767. Thus, the defendants have sufficient informa-

tion within the statutory period to timely apprise them of the nature and scope of the prospective litigation.

**20.** The certifications of the class action by the district court on August 6, 1973, had the effect of then vesting "the class [with] a legal status separate from the interest asserted by [the nominal plaintiffs]," *Sosna v. Iowa,* 419 U.S. 393, 399, 95 S.Ct. 553, 557, 42 L.Ed.2d 532 (1975), and "has important consequences for the unnamed members of the class." *Id.* at 339 n.8, 95 S.Ct. at 557.

(emphasis supplied). Consistent with the limitation,[21] we hold that the commencement of the original class action by Haas tolled the statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action. The amendment of the complaint by the addition of Equibank cardholder Mitchell, therefore, relates back to the initial filing of the complaint on November 13, 1972.

■ A final point relative to the damage period which the parties have not raised but may be appropriate for consideration on remand is the following. The cause of action created by the National Bank Act for recovery of twice the amount of interest paid in an allegedly usurious transaction is based upon the *payment* of usurious interest. Usurious interest *paid* more than two years before the commencement of this suit cannot be recovered. By the same token, however, the statute of limitations may not have run as to any class member who *paid* interest found to be usurious (as opposed to merely the accrual of such interest) during the two years prior to the commencement of the action, notwithstanding the discontinuance by the bank of usurious interest charges before the two-year period began. *See* 12 U.S.C. § 86; *McCarthy v. First National Bank of Rapid City,* 223 U.S. 493, 32 S.Ct. 240, 56 L.Ed. 523 (1912).

Accordingly, we affirm the judgment of the district court insofar as it permits a service charge of one and one-quarter percent per month on bank operated credit card plans involving "consumer" transactions regulated by the Sales Act of Pennsylvania. In all other respects, however, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

VAN DUSEN, Circuit Judge, (dissenting in part):

After consideration of Appellees' Petition for Rehearing and the Answer to such Petition, I am persuaded that the Pennsylvania General Assembly did not intend to prohibit the use of the previous balance method by the terms of the Pennsylvania Goods and Services Installment Sales Act (Sales Act), 69 P.S. § 1101 ff. For this reason, I dissent from part III–C of the majority opinion as amended.

The record, including the Petition and Answer, as well as the briefs, indicates that the 1966 Pennsylvania General Assembly intended by the Sales Act to set an interest rate of 1¼% per month on the outstanding balance as the basic maximum interest rate for retail installment accounts. 69 P.S. § 1904 provides that computations are to be made "on the outstanding balances from month to month." Any reasonable method of computing the monthly balance would seem to be permitted by the Act.

The majority opinion makes clear that "[w]hen the Sales Act was adopted in 1966, the previous balance method was the method most commonly used by both large and small retail merchants in Pennsylvania" (page 1090).[1] If the General Assembly had intended to proscribe its continued use, it would have specifi-

---

21. A recent article considering this limitation makes the following pertinent observation:

> Thus, it will not suffice to be a member of the class alleged in the complaint. Rather, the statute of limitations will be tolled only for persons who would have been members of the class that would have been approved by the trial court had it allowed the action to be maintained as a class action. It may be argued that these limitations imposed by the Court simply reflect an exercise of judicial restraint; namely, that the Court carefully confined its holding to the case before it. More likely, however, the Court recognized

> that some such limitations are necessary to effectuate the nature and purpose of the tolling doctrine.

Wheeler, *Predismissal Notice and Statutes of Limitations in Federal Class Actions After American Pipe and Construction Co. v. Utah,* 48 S.Cal.L.Rev. 771, 782 (1975).

1. See also the first full sentence on page 1090, which states:

> "The previous balance method still is employed by many retailers, including a major department store in Pittsburgh."

cally provided that such method would be illegal.

Furthermore, if this recognized method used by the business community is to be invalidated due to construction of a state statute approximately ten years after the adoption of that act, such action should be taken by a Pennsylvania appellate court. See, for example, *Louisiana P. & L. Co. v. Thibodaux City,* 360 U.S. 25, 27ff, 79 S.Ct. 1070, 3 L.Ed.2d 1058. (1959); The Federal Courts and the Federal System, Hart & Wechsler (2d ed.), at 998–1005.

In all other respects, I concur in the majority opinion.