393 A.2d 704

**Roger E. BUCHANAN et al.**

v.

**CENTURY FEDERAL SAVINGS AND LOAN ASSOCIATION et al., Appellants.**

Superior Court of Pennsylvania.

Argued Nov. 22, 1977.

Decided Oct. 20, 1978.

38

Judd N. Poffinberger, Jr., and Gerald S. Lesher, Pittsburgh, for appellants.

Michael P. Malakoff, Pittsburgh, for appellees.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

PRICE, Judge:

This action was commenced by the filing of a complaint in equity by thirty-six named plaintiffs on behalf of themselves and all similarly situated mortgage borrowers against twenty-nine lending institutions.[1] The plaintiffs sought various relief on claims arising out of the lending institutions' requirement that mortgagors pay, in addition to amounts due

1. Twenty-six institutions are currently involved.

for principle and interest each month, an amount equal to one-twelfth of the aggregate annual real estate taxes and hazard insurance premiums, hereinafter termed escrow payments.[2] The lending institutions involved pay no interest on these escrow payments.

Plaintiffs originally alleged four theories in support of their cause of action. Preliminary objections, in the nature of demurrers, filed by most of the named defendants, were sustained by the lower court. On appeal, the supreme court reversed as to three of the counts, holding that plaintiffs had stated causes of action in trust, constructive trust, and implied contract.[3] The court affirmed the grant of the demurrer to the fourth count which charged a violation of the Truth in Lending Act.

On November 6, 1975, an order was entered by the Court of Common Pleas certifying the plaintiff class, establishing subclasses, and approving a proposed form of notice and procedures for service. Basically, the action was certified as a class action on behalf of all persons who had given or assumed mortgages to the various defendants on residential real property situated in the Pittsburgh SMSA[4] under agreements requiring mortgagors to make monthly escrow payments and who, since January 1, 1972, had made the payments but had not received "interest" for earnings derived from the use of the funds.

In December of 1975, the parties agreed to a proposed settlement of the claims. Petitions for the approval of the settlement were presented to the Court of Common Pleas of Allegheny County and to the United States District Court

2. For a discussion of the history of this procedure, *see Buchanan v. Brentwood Federal Savings & Loan Ass'n,* 457 Pa. 135, 320 A.2d 117 (1974).

3. *Buchanan v. Brentwood Federal Savings & Loan Ass'n.,* 457 Pa. 135, 320 A.2d 117 (1974). Subsequent to the supreme court's decision, Brentwood Federal was dismissed from the case and the caption was amended. For a similar case, *see Felger v. First Federal Savings & Loan Ass'n,* 3 Pa.D. & C.3d 70 (C.P. Lawrence Co. 1975).

4. The Standard Metropolitan Statistical Area for Pittsburgh consists of the counties of Allegheny, Beaver, Butler and Westmoreland.

for the Western District of Pennsylvania, where a companion suit had been filed charging a conspiracy to adopt uniform practices in violation of the anti-trust laws.[5] A notice of the "Pendency and Proposed Settlement of Class Action" approved by both courts was mailed to those individuals whose mortgages had not been satisfied prior to January 1, 1972. Notice to individuals whose mortgages were satisfied prior to this date was by publication.[6]

Joint hearings on the reasonableness of the proposed settlement were held before the common pleas and the district courts.[7] Ultimately, the hearing judge in the Court of Common Pleas of Allegheny County disapproved the settlement, redefined the class and imposed on the defendants the cost of notifying the enlarged class.[8]

The first question presented is whether the order disapproving a class settlement is appealable as a final order. We conclude that it is appealable.[9]

In *Bell v. Beneficial Consumer Discount Company*, 465 Pa. 225, 348 A.2d 734 (1975), our supreme court stated the following:

> "With exceptions not relevant here the Appellate Court Jurisdiction Act gives the appellate courts of the Commonwealth jurisdiction over appeals only from 'final orders.' . . .

5. The federal action apparently is still pending.

6. For the purpose of the settlement agreement the class was expanded to include individuals who had satisfied mortgages after December 7, 1965.

7. Individual notices of the proposed settlement were mailed to 158,428 putative class members. Thirteen written objections were filed and 9,078 class members opted-out of the proposed settlement.

8. On its own motion, the court expanded the class for trial purposes to include those mortgagors who were covered by the proposed settlement agreement. The class was also expanded geographically to include mortgages on residential real property situated in Pennsylvania. This order has also been appealed. Because of our disposition, we need not address this appeal.

9. A motion to quash the appeal alleging that the order was not appealable was denied by our order dated July 20, 1977.

Whether an order is final and appealable cannot necessarily be ascertained from the face of a decree alone, nor simply from the technical effect of the adjudication. The finality of an order is a judicial conclusion which can be reached only after an examination if its ramifications. We follow the reasoning of the United States Supreme Court that a finding of finality must be the result of a practical rather than a technical construction. *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 1226, 93 L.Ed. 1528 (1949)" 465 Pa. at 227–28, 348 A.2d at 735 (footnotes omitted).

*Cohen* [10] established what is known as the "collateral order" doctrine. Under this doctrine, an order which does not place the parties out of court may still be appealable where the order disposes of a matter separate from the merits of the case and where the question is "too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen, supra,* 337 U.S. at 546, 69 S.Ct. at 1226; *see also Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

By its very nature a settlement does not dispose of the case on the merits. Moreover, "[d]isapproval of the settlement is not a step toward final disposition and it is not in any sense an ingredient of the cause of action. In itself, the . . . [lower court's] order is final on the question of whether the proposed settlement should be given judicial approval." *Norman v. McKee,* 431 F.2d 769, 773 (9th Cir. 1970). It is obvious that the final resolution of this case will be extremely complicated and time consuming. Already, several years have passed and two appeals have been engendered since the commencement of this litigation. Moreover, if the case proceeded to verdict it is doubtful that an appellate court could review the settlement. Assuming the decision was reviewable at that time, it would be virtually

10. *Cohen* involved a derivative suit in which the defendant moved, in accordance with state law, to require the posting of security for costs. The Supreme Court held that the denial of the motion was appealable.

impossible to frame a remedy for an abuse of discretion because the element of uncertainty inherent in a compromise would be eliminated.

As the supreme court stated in *Dickinson v. Petroleum Conversion Corp.,* 338 U.S. 507, 511, 70 S.Ct. 322, 324, 94 L.Ed. 299 (1950), the ultimate determination involves a balancing between "the inconvenience and costs of piecemeal review on the one hand and the danger of denying justice by delay on the other." (Footnote omitted). "Considering again the length of trial in . . . [class action cases, we believe that] the right of the unnamed plaintiffs to fair representation may be infringed by the erroneous disapproval of a settlement." *Norman v. McKee, supra* at 774. We hold that orders disapproving class action settlements are appealable as final orders.

In substance, the proposed settlement differentiated between those individuals with mortgages outstanding on January 1, 1976, and those individuals who had satisfied mortgages between December 7, 1965, and January 1, 1976. As to the former group, the proposed agreement as amended [11] provided, in section 3.03, as follows:

11. In his opinion, the hearing judge stated that the settlement which was proposed and heard was never amended. 125 P.L.J. at 54 n. 10. The record demonstrates that in response to certain objections to the settlement, two sets of amendments were filed on May 31, and June 1, 1976. These amendments were properly before the court and the failure to act on them constituted an abuse of discretion.

The second set of amendments made five changes. First, section 3.03(c) was amended to provide for the election to be made in writing after the lender has issued a written commitment to make the loan. Second, section 4.01(a), which permits the cancellation of obligations under the agreement if certain legislation is passed or regulations are adopted, was clarified to specify the applicable regulatory agencies. Section 4.01(b) which permits cancellation if the practice of collecting payments without interest is approved under federal and state law by an appellate court of at least statewide jurisdiction, was amended to provide that this provision could not be invoked for five years. Section 3.08, which is a release, was amended to include a qualifying provision to insure that individuals still have a cause of action against an institution for misapplication of the escrow funds. The final change deleted section 3.09. This section provided for the reduction "of any verdict rendered against the alleged tortfeasors or defendants . . . by the pro-rata share of any Defendant released

"Beginning on the date of the final approval of this Agreement, but retroactive to January 1, 1976, the Defendants either:

(a) Shall pay at least two (2) percent interest per annum to their Residential Mortgagors on sums paid to a particular Defendant equal to one-twelfth the annual hazard insurance premiums, annual real estate taxes and/or assessments or other charges;

(b) Shall credit such advance payments against the principle balances on such mortgage loans; or

(c) Shall grant, by writing separate from the mortgage and bond or note, such mortgagors the option either of paying their annual hazard insurance premiums, annual real estate taxes and/or assessments or other charges themselves, or of making such payments equivalent to one-twelfth of such amounts each month to Defendants, in which case, no interest need be paid by Defendants on such payments.

If interest is to be paid by a Defendant under Subsection (a) herein, it shall be calculated in a manner no less favorable to Plaintiffs than 2 percent simple interest, on the average of the month-end escrow balances, paid or credited annually."

For those individuals who satisfied a mortgage prior to January 1, 1976, the agreement provided as follows:

"3.04. If any of the Defendants grant a mortgage loan on residential real estate from one to four families on or before January 1, 1979, to any Plaintiff who has paid off a mortgage with the same Defendant between December 7, 1965 and January 1, 1976, the said Defendant will charge

herein . . .." "This provision is intended to obviate the necessity and expense of having a Defendant released herein remain a party on the record and obliged to participate at its expense at a trial merely for the purpose of determining if in fact it was a tortfeasor so as to entitle the other tortfeasors to a pro-rata reduction of any verdict."

The first amendment made only one change, the inclusion of the five year period in section 4.01(b) which was incorporated into the second set of amendments. For the purpose of this opinion, we will treat the settlement as incorporating the second set of amendments.

said Plaintiff a loan origination or service fee which is one half of the fee then generally in effect for said Defendant for such types of loans. Defendants agree to use reasonable efforts to determine if applicants for a mortgage loan are entitled to this reduction of fee but Defendants do not warrant that each such applicant will be discovered to be a prior mortgagor."

Additionally, the defendants agreed to pay attorneys fees up to $625,000 plus filing and service costs.

Pa.R.C.P. No. 2230(b), which applies to the instant case,[12] provides that "[a]n action brought on behalf of a class shall not be dismissed, discontinued, or compromised nor shall a voluntary nonsuit be entered therein without the approval of the court in which the action is pending." This rule is designed to protect absent class members "from prejudicial and binding action by their representative." *Shapiro v. Magaziner,* 418 Pa. 278, 286, 210 A.2d 890, 895 (1965). Prior to approving a class settlement, a lower court must conclude that it is fair and reasonable and adequately protects the members of the class. Although there is no formula for making such a determination, the criteria heretofore employed by the courts include evaluations of (1) the risks of establishing liability and damages, (2) the range of reasonableness of the settlement in light of the best possible recovery, (3) the range of reasonableness of the settlement in light of all the attendant risks of litigation, (4) the complexity, expense and likely duration of the litigation, (5) the stage of the proceedings and the amount of discovery completed, (6) the recommendations of competent counsel, and (7) the reaction of the class to the settlement. *See, e. g., Girsh v. Jepson,* 521 F.2d 153 (3d Cir. 1975).[13] In effect the

12. Pa.R.C.P. No. 2230 was rescinded on June 30, 1977, effective September 1, 1977, and was replaced by Rule 1714(a). Both provisions are substantially the same and are based on Federal Rule 23(e).

13. Although state courts are not necessarily bound by federal precedent, "[w]here we find cases decided under the Federal rule persuasive . . . we may follow them . . . ." *McMonagle v. Allstate Insurance Company,* 460 Pa. 159, 167, 331 A.2d 467, 471

court should conclude that the settlement secures an adequate advantage for the class in return for the surrender of litigation rights. As with valuation problems in general, there will usually be a difference of opinion as to the appropriate value of a settlement. For this reason, judges should analyze a settlement in terms of a "range of reasonableness" [14] and should generally refuse to substitute their business judgment for that of the proponents. 3 H. Newberg, *Newberg on Class Actions,* § 5610b (1977).

 The question on appeal from an order approving or disapproving a class settlement is whether the lower court abused its discretion in reaching its decision. *Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799 (3d Cir. 1974). Under Pennsylvania law, generally, an appellate court will find an abuse of discretion if the record shows that, "the law has been overriden or misapplied, or that the judgment exercised by the Court was manifestly unreasonable or motivated by partiality, prejudice, bias or ill-will. . . . " *Rosenberg v. Silver,* 374 Pa. 74, 77, 97 A.2d 92, 94 (1953).

Turning to the lower court's opinion in the instant case, the following passages set forth its position regarding the risks of establishing the plaintiffs' case.

"The defendants, in their appeal, contend that I 'failed to properly evaluate the proposed settlement as amended because I misapprehended the applicability of the substantive law of trust, constructive trust, and implied contract to the facts alleged in the complaint in this action.' In *Buchanan v. Brentwood Federal Savings and Loan Association,* 457 Pa. 101 [135], 320 A.2d 117 (1974), the Supreme

(1975); *quoting, McMonagle v. Allstate Insurance Co.,* 227 Pa.Super. 205, 237, 324 A.2d 414, 429 (1974) (Spaeth, J., dissenting).

**14.** In *Newman v. Stein,* 464 F.2d 689, 693 (2d Cir. 1972), *cert. denied sub nom. Benson v. Newman,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972), the court explained this concept by stating "that in any case there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion—and the . . . [order approving a settlement] will not be reversed if the appellate court concludes that the settlement lies within that range.

Court explicitly stated that a cause of action was set forth in the complaint on theories of trust, constructive trust and implied contract and reversed the lower court's sustaining of the demurrer of these defendants.

. . . . .

[I]t is very possible that in addition to the law of trusts, constructive trusts and implied contracts, theories of law pertaining to contracts of adhesion and to the concept 'of judicial sensitivity towards imposition upon members of the public by persons, who through experience, economic strength or monopolization are able to exercise unfair advantage' will be applied to this case. See *Phillips Home Furnishing, Inc. v. Continental Bank,* 231 Pa.Super. 174, 331 A.2d 840 (1974). These last two legal theories, which are potentially very important to this case, have not even been considered by the defendants.

In the course of fully and properly evaluating the proposed settlement agreements, I, of course, had to develop an opinion as to the merits of the plaintiffs' case in order to justly evaluate the reasonableness and adequacy of the proposed settlement. Without prejudging this case, I conclude that the plaintiffs have, potentially a good case against the defendants." 125 P.L.J. at 54–56 (footnotes omitted).

First, it should be noted that in count two of their first amended complaint, plaintiffs alleged that because of their inferior bargaining position, they were forced to agree to the escrow provisions and that these terms constituted a contract of adhesion which was against public policy and therefore void. Preliminary objections in the nature of a demurrer were sustained and this theory was not advanced on appeal. The plaintiffs have finally litigated this claim under a theory closely related, if not identical, to law of the case. *See generally Blymiller v. Baccanti,* 236 Pa.Super. 211, 344 A.2d 680 (1975). This claim was abandoned by competent counsel long before the action was certified as a class action. In their brief, plaintiffs' counsel assert that the "contract of adhesion" theory was thoroughly researched,

briefed and argued unsuccessfully before the lower court, *see Buchanan v. Brentwood Federal Savings and Loan Association,* 121 P.L.J. 247 (1973), and that it was not pursued because plaintiffs do not view it as a viable claim. We conclude that the lower court erred in considering this theory.

■■ In evaluating the likelihood of success, the lower court should not attempt to resolve unsettled issues or legal principles. *West Virginia v. Chas. Pfizer and Company,* 440 F.2d 1079 (2d Cir.), *cert. denied sub nom. Cotler Drugs, Inc. v. Chas. Pfizer and Co.,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). The court should, however, attempt to make a reasonable estimate of the probability of success. *See Young v. Katz,* 447 F.2d 431 (5th Cir. 1971). In most cases, the resolution of this question will present a delicate balancing problem for the lower court. It is obvious, however, that the lower court must proceed further than a mere determination that a cause of action has been stated sufficiently to withstand preliminary objections. It appears from the above quoted passage that the lower court decided that the plaintiffs "have potentially a good cause of action" based on the supreme court's holding in *Buchanan I.* This was error.

After concluding that plaintiffs had a good cause of action, the lower court analyzed the terms of the settlement in the following way:

"Under the terms of this proposed agreement, the mortgagor-plaintiffs could wind up 'receiving' anywhere from zero percent to two percent interest (see § 3.03 a & c) and that interest could be capitalized against their mortgage (cheap capitalization in view of the fact that capitalization under 3.03(b) involves interest rates of up to 9%) or wherein it would stay in the mortgagor's escrow account until the mortgage was paid off—delayed benefit plus inflation can reduce this benefit.

*The giving of only up to 2% interest for the use of another's money is ridiculous in this day and age. The United States government cannot even get interest rates*

*that low and it has the best credit rating in our country. Further, the defendants co-mingle these escrow accounts with their other deposit monies and invest in items which range from 5½% up to 15% interest for home improvement loans, auto loans, etc."* 125 P.L.J. at 56–57 (footnotes omitted).

■ Our primary point of general disagreement with the analysis employed by the lower court is embodied in the italicized portion of the above quoted passage. It may well be true that two percent interest on a loan is ridiculous in today's market. In the instant case, however, the parties are not involved in the negotiation of a loan; they are involved in very complex litigation where a myriad of factors has emerged. After determining that the plaintiffs' cause of action was potentially meritorious, the lower court never attempted to establish a range of reasonableness in light of the attendant risks of litigation.[15] Actually, by reviewing the case in this manner, the court acted as if it had granted summary judgment for the plaintiffs on the liability issue. This was without question an inappropriate standard of review.

It is now necessary to turn from a general discussion of the court's analysis to a more detailed examination of the case, to determine if, under the facts, the court's decision not to accept the settlement was manifestly unreasonable. Probably the most important factor for consideration involves an assessment of the risks involved in establishing liability or damages. In the instant case there are a number of substantive and procedural questions which could preclude recovery by some or all of the class members. The following portion of the opinion discusses these issues.

From the plaintiffs' perspective, possibly the strongest substantive theory involves the contention that an express trust has been created. In *Buchanan I,* the supreme court

15. There is some indication that the court did not even attempt to establish a range of reasonableness in light of the best plausible recovery and that only the best recovery conceivable would have been accepted.

stated, in part, as follows: "The term 'trust' is a very broad and comprehensive one. Every deposit is a trust, except possibly general bank deposits; every person who receives money to be paid to another or to be applied to a particular purpose is a trustee. . . ." *Buchanan I, supra,* 457 Pa. at 144, 320 A.2d at 123, *quoting, Vosburgh's Estate,* 279 Pa. 329, 332, 123 A. 813, 815 (1924).

█ It must be remembered, however, that the supreme court was deciding whether, admitting all of the well pleaded facts in the complaint, and all inferences reasonably deducible from the facts, the complaint stated a cause of action. The court noted that on remand, appellants would have to prove all elements of a trust. In support of this proposition, the court cited section 2 of the Restatement (Second) of Trusts (1959).[16] Section 2 clearly states that there must be a manifestation of an intention to create a trust. Under section 12, it is asserted that "a debt is not a trust." The following two statements from Comment b are relevant to the instant case:

"If money is deposited in a bank for a special purpose, the bank is not a trustee or bailee of the money *unless it is the clear understanding of the parties* that the money is not to be used for its own purposes." (Emphasis added).

"Where the deposit is in escrow, that is where the money is to be paid to a third person on the happening of a designated event and in the meantime the depositer has no right to withdraw the money, *it depends upon the manifestation of the intention of the parties whether the bank may use as its own the money deposited or whether the money shall be held in trust.* Such a deposit ordinarily indicates an intention that the bank may use the money as its own, the bank undertaking to pay the third person the

---

**16.** In *Thompson Will,* 416 Pa. 249, 206 A.2d 21 (1965) also cited by the *Buchanan* court, it was held that the following elements must coalesce before a trust will be declared, " 'sufficient words to create a definite subject, and a certain or ascertained object; and to these requisites may be added another, viz, that the terms of the trust should be sufficiently declared . . . .' " *Id.,* 416 Pa. at 255, 206 A.2d at 25, *quoting, Smith's Estate,* 144 Pa. 428, 437, 22 A. 916, 917 (1891).

amount of the deposit on the happening of the designated event." (Emphasis added).

While the plaintiffs' claims are clearly not defeated by the above quoted passages, the language certainly does raise some doubt as to the ultimate strength of the case.[17]

**17.** The opinion in *Vosburgh's Estate,* 279 Pa. 329, 123 A. 813 (1924), contains language directly contrary to the first passage quoted above. The language in that case is imprecise under the theory generally used today. For example, in *Vosburgh* it is also stated that "[t]he cases of hirer and letter to hire, borrower and lender, pawner and pawnee, principal and agent, are all cases of express trust. . ." *Id.,* 279 Pa. at 332, 123 A. at 815. Although these relationships may have similar characteristics, it is generally held that debt, bailment or agency relationships are not trusts. *See* 1 A. Scott, *The Law of Trusts,* §§ 5, 8, 8.1, 12, 12.9 (1967). Moreover, *Vosburgh* did not involve an escrow with a bank. In that case, the Donoughe Lumber Company purchased a quantity of lumber from Vosburgh and paid with notes. "It was understood between the parties these notes could not always be lifted at maturity, and renewals thereof would be arranged. Donoughe Company, prior to maturity of any note or notes which it was unable to pay, would forward new notes in an amount sufficient to realize enough funds to take care of maturing obligations. These notes were to be discounted by Vosburgh, and the proceeds forwarded to Donoughe Company, so that when the original notes become due, Donoughe Company would have sufficient funds to pay the original notes in full." *Id.,* 279 Pa. at 330, 123 A. at 814. Vosburgh died and funds from the discounting of some of these notes had been deposited in a general bank account. The lower court held that Donoughe Company was not entitled to preference over other creditors because Vosburgh was a debtor rather than a trustee. The supreme court reversed, holding that Vosburgh had been a trustee as to the funds. *Vosburgh* is distinguishable from the instant case because there the intention to create a trust was evidenced by the fact that the actual *proceeds* were to be delivered to Vosburgh. Absent circumstances indicating a contrary intent, it is generally agreed that in a case involving a general deposit for a special purpose, the inference should be that the bank is entitled to use the money as its own. 5 A. Scott, *The Law of Trusts,* § 530 (1967).

In *Buchanan I,* the supreme court discussed the possibility of a debtor-creditor relationship and held that it could not conclude, as a matter of law, that such a relationship was established. In support of its decision, the court cited *Carpenter v. Suffolk Franklin Savings Bank,* 362 Mass. 770, 291 N.E.2d 609 (1973), which held under facts similar to *Buchanan* that a cause of action in trust had been set forth. After a trial on the merits, the lower court held that neither an express nor a constructive trust had been created. This decision was affirmed on appeal. *Carpenter v. Suffolk Franklin Savings Bank,* 346 N.E.2d 892 (Mass.1976). Although *Carpenter* obviously does not control our case, it certainly is relevant to counsels' decision to settle.

In addition, several of the defendant-lending institutions provide language similar to the following in their mortgage documents: "No amount so paid (escrow payments) shall be deemed to be trust funds but may be comingled with the general funds of Mortgagee, and no interest shall be payable thereon." *See* mortgage note from Samual J. and Lois K. Blaufeld to Equibank. *See also* mortgage documents of Stanton Federal Savings and Loan Association, Fidelity Savings Association, and Guaranty Savings and Loan Association. In *Richman v. Security Savings and Loan Association,* 57 Wis.2d 358, 204 N.W.2d 511 (1973), strikingly similar language was held to establish, as a matter of law, that there was no intention to create a trust.[18] Certainly at trial, oral or written evidence specifically negating the existence of a trust could be introduced against individual mortgagors or perhaps entire subclasses.

For their second theory of recovery, plaintiffs contend that the escrow payments should be subjected to a constructive trust.

"The question whether a constructive trust is to be imposed on the profit earned by the investment . . . of [plaintiffs'] monthly tax payments can be resolved only by answering the more fundamental question whether 'the conscience of equity' would conclude that the mortgagees would be unjustly enriched were they permitted to keep the funds.

It is rare that the existence or absence of justification for imposing an equitable remedy, especially a constructive trust, can be decided as a matter of law. Only after all the facts are before a court, can it in most cases properly determine the issue." *Buchanan I, supra,* 457 Pa. at 152, 320 A.2d at 127.

See also *Brooks v. Valley National Bank,* 113 Ariz. 169, 548 P.2d 1166 (1976).

**18.** *Richman* was distinguished in *Buchanan I* because, "[t]here [was] nothing in the pleadings of any of the parties to indicate that any mortgage agreement . . . expressly allowed a mortgagee to commingle the monthly tax payments with its own funds." 457 Pa. at 145–46 n. 11, 320 A.2d at 123–24 n. 11.

At trial, plaintiffs would bear the burden of proving that defendants would be unjustly enriched. *See Buchanan I, supra; Metzger v. Metzger,* 338 Pa. 564, 14 A.2d 285 (1940). To fulfill the "unjustness" requirement, plaintiffs alleged in their complaint that (1) the mortgagors and mortgagees stood in a confidential relationship, (2) there was a substantial inequality in bargaining position, (3) the mortgagees were agents for the mortgagors and (4) as a matter of public policy, the ends of public justice demand the imposition of a constructive trust.

Although the intent of the parties is not necessarily controlling on the question of whether to impose a constructive trust, it would be curious indeed for a court to adopt the position embodied in Comment B to section 12 of the Restatement and then determine that equity demands the imposition of a constructive trust. For this reason most of the problems expressed with regard to the express trust apply to the constructive trust, particularly to the fourth allegation, albeit for somewhat different reasons. The problems involved in proving these allegations are at least as difficult as those involved in proving an express trust and will in all probability depend in large part on dealings between individual parties. Finally, there is some suggestion that a written agreement precludes the finding of an unjust enrichment necessary for the invocation of the constructive trust doctrine. *See Buchanan I, supra* (concurring and dissenting opinion of Justice Pomeroy).

Plaintiffs' final theory involves the creation of an implied contract. In addition to issues discussed previously in relation to the other allegations, the implied contract suffers from at least two drawbacks. First, as set forth in the complaint, this count applies only to those plaintiffs who entered a mortgage relationship with a bank that, during the term of the mortgage, switched from capitalizing the payments to escrowing them. The vast majority could not recover under this theory. Moreover, as a matter of law, there is a very real question whether a contract to capitalize could be implied from any of the applicable documents. *See Buchanan I, supra.*

Assuming that all of the above recounted issues are resolved in the plaintiffs' favor, the defendants assert the following defenses to some or all of the claims: Federal pre-emption, see 12 C.F.R. 545.6–11(c); [19] lack of privity with certain defendants; [20] waiver; estoppel; laches and statute

**19.** This regulation, adopted by the Federal Home Loan Bank Board provides, in part, that:

"A Federal association which makes a loan on or after June 16, 1975 on the security of a single-family dwelling occupied or to be occupied by the borrower . . . shall pay interest on any escrow account . . . (1) if there is in effect a specific statutory provision or provisions of the State in which such dwelling is located by or under which State-chartered savings and loan . . and similar institutions are generally required to pay interest on such escrow accounts, and (2) at not less than the rate required to be paid by such State-chartered institutions but not to exceed the rate being paid by the Federal association on its regular accounts. . . . *Except as provided by contract, a Federal association shall have no obligation to pay interest on escrow accounts apart from the duties imposed by this paragraph.* (Emphasis added). There is very strong precedent for the view that earlier regulations implicitly approved the practice of escrowing without interest and that federal regulations have pre-empted state control of this area. In *Greenwald v. First Federal Savings & Loan Ass'n.*, 446 F.Supp. 620 (D.Mass.1978), it was held, in an action for a declaratory judgment, that a Massachusetts' law requiring interest payments was unconstitutional when applied to federal savings and loan institutions because the statute violated the Supremacy Clause, U.S.Const. Art. VI, Cl. 2. *See generally Meyers v. Beverly Hills Federal Savings & Loan Ass'n.*, 499 F.2d 1145 (9th Cir. 1974); *Murphy v. Colonial Federal Savings & Loan Ass'n.*, 388 F.2d 609 (2d Cir. 1967); *California v. Coast Federal Savings & Loan Ass'n.*, 98 F.Supp. 311 (S.D.Cal.1951); *Kaski v. First Federal Savings & Loan Ass'n.*, 72 Wis.2d 132, 240 N.W.2d 367 (1976). Eleven institutions involved in this case are governed by this regulation. None of the above cited authority holds that a federal savings and loan association could not contract to pay interest on escrow payments prior to June 16, 1975. While we express no opinion on whether a savings and loan could agree to pay interest prior to June 16, 1975, we note that such a claim is dubious since it would lead to the highly unusual result of pre-empting the common law of trust and contract. Assuming that the common law remains intact, however, the regulations are still relevant to show that there was no intent to create a trust and also that a constructive trust should not be imposed.

**20.** Although the point has not been decided in this state, the majority rule appears to be that a named plaintiff who has had no dealings with a particular defendant may not maintain a class action against that defendant. *Haas v. Pittsburgh National Bank,* 526 F.2d 1083 (3d Cir. 1975); *LaMar v. H & B Novelty & Loan Co.,* 489 F.2d 461 (9th Cir. 1973); *Chevalier v. Baird Savings Association,* 66 F.R.D. 105

of limitations. Suffice it to say that none of these claims is frivolous.

As to the damage issue, plaintiffs' counsel stated at the hearing that:

"I'd agree . . . in 1971–1972 that I thought the banks or lenders were making a substantial profit. But after four years of litigation and discovery and depositions and interrogatories, we came to the conclusion that there were certain lenders losing money. That there were certain lenders that were making small amounts, and there are certain lenders that might have been making as high as—and here it is hard for me to say—as high as three and four percent after taking off costs. Which, based on our discovery, found no lender that was making windfall profits." (NT 485–86).[21]

It is obvious that, as in any valuation problem, a determination of the amount of profits will be very complicated. For

(E.D.Pa.1975). In *Chevalier,* plaintiffs in an escrow suit similar to the instant case were precluded from maintaining an action against any defendant with whom no representative plaintiff had any dealings. Nine institutions would be dismissed if this rule was applied to the instant case. A substantially greater number could be partially excluded if the rule requires a representative plaintiff for each mortgage form used by a bank.

21. This opinion was based on extensive pre-trial discovery. At least 56 depositions were taken and 16,000 interrogatories answered. Many of the figures presented in this discovery were based on pre-litigation studies. While it is true that a trial judge must guard against collusion between the parties, where as in the instant case there is no hint of collusion and where extensive discovery occurred while the parties were clearly in adversary positions, the recommendations and opinions of counsel are entitled to substantial consideration. "The weight accorded to the recommendation of counsel is dependent on a variety of factors, namely, length of involvement in the litigation, competence, experience in the particular type of litigation, and the amount of discovery undertaken. Usually, a consideration of the criteria involved leads the court to the conclusion that the recommendation of counsel is entitled to great weight." 3 H. Newberg, *Newberg on Class Actions,* § 5601 d (1977) (footnote omitted); *see also International House of Pancakes Franchise Litigation,* 1973–2 Trade Cases 74, 616 (W.D.Mo.1973), *aff'd* 487 F.2d 303 (8th Cir. 1973); *Cannon v. Texas Gulf Sulphur,* 55 F.R.D. 308 (S.D.N.Y. 1972).

example, defendants would argue that the profits should be measured on the basis of interest available on short term investments while plaintiffs would contend that the interest rate should be higher since the funds were co-mingled with the general bank funds. Moreover, profits will vary from year to year as well as from bank to bank depending on variable factors such as the interest rate available at that time on short and long term investments and the cost of administering the accounts.

Based on the foregoing, it should be obvious that a large percentage of the plaintiffs' claims suffer substantial barriers. At the very least, counsels' representations are clearly supported by the law and the facts. We, therefore, disagree with the lower court's characterization of the likelihood of success.

■■■ As previously noted, the lower court failed to consider the range of reasonableness of the settlement in light of the attendant risks of the litigation.[22] It did hold that under the current settlement "plaintiffs could wind up receiving anywhere from zero percent to two percent interest," and concluded that this was an insubstantial benefit to the class. The first assertion is clearly misleading. Although section 3.03(c) does provide for escrowing without interest, the mortgagor retains the option of paying his own taxes and insurance premiums where they fall due. If a mortgagor chooses to pay his own taxes and insurance he can, in effect, establish a self escrowing procedure and pay

22. The court subsequently did approve a settlement with Dollar Savings Bank and Suburban Savings and Loan Association which basically provided for either the payment of interest at a rate of 1¼ % below passbook rates (currently this would be approximately 4%) or the capitalization of the tax and insurance payments. These settlements, however, are not particularly helpful in establishing the range of reasonableness because of the method of analysis employed by the court. These settlements are not even particularly useful to determine the settling defendants' perception as to the merits of the case because the agreements contain "most favored nation" clauses which call for a reduction if a more favorable settlement is reached with the other defendants.

one-twelfth of the annual cost in a general savings account each month and receive passbook interest. If the mortgagor decided to escrow the funds with the bank, he presumably has concluded that it is worth the cost. Under the capitalization method, § 3.03(b), a mortgagor effectively receives interest equivalent to the interest rate on the mortgage. The judge below should have considered two percent as the lowest rate of return on the settlement.

■■■■ With regard to the back claims, the lower court concluded that the benefits to the class are very speculative. While this may be true, it would not invalidate an otherwise reasonable settlement. The federal courts have routinely held "[t]hat . . . [the fact that the benefits] are *in futuro* does not render them valueless or intangible, nor is it a bar to approval." *Trainor v. Berner,* 334 F.Supp. 1143, 1149 (S.D.N.Y.1971); *see also Merola v. Atlantic Richfield Co.,* 493 F.2d 292 (3d Cir. 1974).

Based on the foregoing we conclude that the lower court's decision to refuse the settlement was manifestly unreasonable. We will therefore reverse the lower court and order the acceptance of the amended settlement. We note that in future cases, even where we conclude that a lower court abused its discretion in considering a proposed settlement, we may be required to remand the case for further hearings and consideration. Where, as here, we conclude that the decision to reject the settlement was manifestly unreasonable, we can perceive no valid reason for requiring further delay and expense to the parties.

The order of the lower court is reversed and the case is remanded for compliance with this opinion.

WATKINS, former President Judge, and HOFFMAN, J., did not participate in the consideration or decision of this case.