DAUPHIN DEPOSIT BANK AND TRUST COMPANY, Appellant,

v.

Ralph W. HESS, Joan B. Pattison, and Jared L. Hock, Individually and On Behalf Of All Others Similarly Situate, Appellees.

Superior Court of Pennsylvania.

Argued March 5, 1997.

Filed July 10, 1997.

Reargument Denied Sept. 22, 1997.

Leroy S. Zimmerman, Harrisburg, for appellant.

Christopher C. Conner, Harrisburg, for appellees.

Before CIRILLO, President Judge Emeritus, and POPOVICH and HESTER, JJ.

POPOVICH, Judge:

We reverse the order of the Court of Common Pleas of Cumberland County refusing to approve the settlement of a class action suit.

The record discloses that Dauphin Deposit Bank and Trust Company (hereinafter the "Bank") filed a complaint seeking a declaratory judgment to terminate approximately 4,300 individual retirement accounts (hereinafter "IRA") opened between January 1, 1982, and June 30, 1984, and the proposed certification of a defense class represented by Ralph W. Hess, Joan. B. Pattison and Jered L. Hock. Once the court certified the class, extensive discovery occurred and included requests for the production of documents, interrogatories and approximately one hundred and thirty depositions.

Thereafter, both sides moved for summary judgment on the Bank's request for declaratory relief. After briefing and argument, the trial court denied the motions and a bench trial commenced on April 1, 1996, and continued until April 4, 1996. The court suspended the trial indefinitely on April 10, 1996, to allow the parties to pursue a settlement. After extensive negotiations, the parties moved for settlement on May 13, 1996. A notice was sent to the entire class outlining the proposed offer to resolve the case.

> The proposed settlement divided those class members, who chose not to opt out of the settlement, into two subclasses. For both classes, the eighteen-month variable rate account of each class member would be closed and the balance deposited in a certificate of deposit. So-called "class A" members would be given the option of a "ten for ten" certificate of deposit or a 9.35% APY fixed rate, ten-year certificate. Class B members would receive a "premium interest, ten-year certificate of deposit" with an annual percentage yield of not less than seven percent.
>
> In order to qualify as a class A member, the notice of settlement required that the class member submit an affidavit, postmarked no later than June 15, 1996, setting forth the verbal or written evidence upon which the member claims to have been advised or led to believe [by Bank personnel] that the eighteen-month variable rate account could not be unilaterally terminated or discontinued by the [B]ank.

> A failure to file the affidavit by June 15th or to opt out of the settlement by the same date resulted in the person automatically being placed in class B.
>
> In addition, class members were given written notice that there would be a hearing on June 21, 1996. The notice further provided that if a member objected to the proposed settlement and desired to make that objection known to the court, it was incumbent upon that person to file objections in writing with the Prothonotary's Office on or before June 15, 1996. The filing of objections would not have the effect of excluding a member from the class but even objectors would be bound by the settlement if it were eventually approved by the court. The notice prominently notified the class members that if they elected to be excluded from the settlement they would not be bound by its terms or, by the same token, receive any of the benefits of it. Those to be excluded from the class were warned that any subsequent action between them and the [B]ank would entail individual responsibility for costs of litigation [which had been paid by the Bank until then] including, but not limited to attorney's fees.

Trial Court Opinion, 7/11/96, at 2–3.

The court conducted a hearing on June 21, 1996, at which eighty-nine formal objections were filed and a lesser number of individuals elected to opt out of settlement. Thereafter, even though counsel for the Bank and the class moved for settlement, the court rejected the plan on the basis that: 1) the process was "not sound" in that the class had to make decisions prior to knowing whether the court would approve the settlement; 2) the objections raised were of sufficient "quality" to reject settlement; 3) the objectors' probability of success, if the case were tried to conclusion, was "a reasonable one"; and 4) the creation of a defense class at the request of the Bank to secure a favorable financial ruling or dispense with a trial to approve settlement in the name of expediency denies "a day in court to the account holders".

■ The present appeal ensued and claims, in essence, that the trial court abused its discretion in rejecting settlement. *Bryan v. Pittsburgh Plate Glass*, 494 F.2d 799 (3d Cir.1974). Under Pennsylvania law, an ap-

pellate court will find an abuse of discretion if the record shows that, "the law has been overridden or misapplied, or that the judgment exercised by the Court was manifestly unreasonable or motivated by partiality, prejudice, bias or ill-will . . . ." *Rosenberg v. Silver*, 374 Pa. 74, 97 A.2d 92, 94 (1953).

 Additionally, in assessing the merits of the appellant's claim, we look to various criteria employed by the courts in evaluating the propriety of a class settlement; to-wit: (1) the risks of establishing liability and damages, (2) the range of reasonableness of the settlement in light of the best possible recovery, (3) the range of reasonableness of the settlement in light of all the attendant risks of litigation, (4) the complexity, expense and likely duration of the litigation, (5) the stage of the proceedings and the amount of discovery completed, (6) the recommendation of competent counsel, and (7) the reaction of the class to the settlement. *See, e.g., Girsh v. Jepson*, 521 F.2d 153 (3d Cir.1975). In effect the court should conclude that the settlement secures an adequate advantage for the class in return for the surrender of litigation rights. As with valuation problems in general, there will usually be a difference of opinion as to the appropriate value of a settlement. For this reason, judges should analyze a settlement in terms of a "range of reasonableness" and should generally refuse to substitute their business judgment for that of the proponents. 3 H. Newberg, *Newberg on Class Actions*, § 5610b (1977).

*Buchanan v. Century Fed. Sav. & Loan Ass'n*, 259 Pa.Super. 37, 393 A.2d 704, 709 (1978).

With the preceding in mind, it is to be recalled that the court's initial reason for disapproving the settlement was its dissatisfaction with the way the settlement process unfolded, i.e., class members were to decide whether to opt out prior to knowing if court approval would be secured. This had the deleterious effect, so opined the court, of inhibiting objectors faced with having to initiate individual suits and absorb the cost of litigation previously paid by the Bank if they refused to join the settlement.

 If such were a meritorious argument, then there would never be a settlement since the expense of individual litigation would always be burdensome and a factor to be avoided by any objector to settlement. Further, there is nothing damning about requiring a class member to choose between class membership or opting out *before* the court rules upon the settlement short of completing litigation. See *Duban v. Diversified Mortgage Investors*, 87 F.R.D. 33, 40 (S.D.N.Y. 1980) ("Mayer argues that she must decide whether or not to file a claim and participate in the settlement before she learns of the court's decision with respect to her objection. The court finds the dilemma illusory and therefore concludes the argument is without merit. Although Mayer is opposed to the settlement in its present form, she would have lost nothing by filing a claim and executing a release in a timely fashion. If the settlement were approved as is now the case, she would not have been precluded from participating. Had the settlement been disapproved, all releases and claims would have been void . . . .").

 More importantly, *Buchanan* requires that a court know the class members' reaction to the proposed settlement in advance of making a determination as to the "reasonableness" of the plan. Thus, of necessity, class members must disclose their views (pro or con) prior to the court assessing the merits of any settlement offer. Anything less would foster abuse by class members in refraining from participating in the suit until the outcome, whether favorable or unfavorable, appears ascertainable.[1] See

---

1. Interestingly, in an analogous situation, the bankruptcy court sets a hearing date to allow all those who object to a bankrupt's proposed Chapter 7, 11 or 13 plan for extraction from indebtedness to voice their complaints in advance of the court approving any plan. This allows the court to take such objections into consideration in deciding whether to approve or disapprove the bankrupt's plan for re-organization or complete satisfaction of all debts to creditors. See 11 U.S.C. § 1129(a)(7)(A)(i), (8)(A).

In the same vein, the court in a class action suit must weigh the *Buchanan* factors (of which the objection of the class members is one element) prior to deciding whether to accept the settlement proposal as within the "range of reasonableness" sufficient to compensate the class members for relinquishing their legal rights.

*American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 547, 94 S.Ct. 756, 763, 38 L.Ed.2d 713 (1974); 2 *Newberg On Class Action,* § 8.10 at 8–33.

 Next, we turn to the most important factor to consider in reviewing the court's actions, i.e., *assessment of the risks involved in establishing liability or damages. Fischer v. Madway,* 336 Pa.Super. 289, 485 A.2d 809, 812 (1984). In evaluating the likelihood of success, a court should not attempt to resolve unsettled issues or legal principles but should attempt to estimate the reasonable probability of success. *Buchanan,* supra.

Here, at the outset, the court stated that the chances of success were evenly split between the parties. Then, after listening to four days of testimony, the court believed the outcome of the case would be different. More specifically, the court was "satisfied that the defendants' probability of success [wa]s a reasonable one." Trial Court Opinion, 7/11/96 at 9.

The court's belief was predicated upon the simplicity of the issue to be decided: Was the 18–month variable rate account (paying no less than 10%) "automatically renewable" for an indefinite period at the defendants' discretion? and the specificity with which the defendants recalled being promised a 10% interest rate for the purposes of retirement. *Id.* at 8.

This assessment by the court was made by *discounting the plaintiff's evidence* (as insignificant and less than compelling) in favor of the defendants' *proposed* testimony of numerous account holders' recollection of conversations with bank officials and the assurances given prompting them to forego investing in higher rates elsewhere. Therefore, the court believed, to settle the matter short of a completed trial would prevent the defendants from presenting additional evidence that *would permit them to prevail.* This is a premature announcement of the

"outcome" of the case which goes beyond estimating the reasonable probability of success and interjects the court into the forbidden area of "resolving unsettled issues" (e.g., questions of credibility)[2] precluded by *Buchanan,* supra.

The plaintiff's witnesses were uniform in denying authorizing, approving or promoting the dissemination of information to the public that the 18–month variable rate accounts were "automatically renewable" upon maturity at the will of the account holder for an indefinite period.[3] See Trial Transcript, 4/1/96 at 32–33, 83, 91, 103, 110, 118, 122, 148, 154, 172–174, 189, 193, 206 & 214–215; Trial Transcript, 4/2/96 at 12, 21, 25, 34, 37, 45, 47, 48, 58, 68, 70, 78, 85, 86, 98, 100–111 & 139; Trail Transcript, 4/3/96 at 66, 81, 91 & 95.

Furthermore, all of the plaintiff's literature generated for distribution to prospective IRA customers was replete with reference to the fact that the 18–month variable rate account would be in effect "as long as" Dauphin Deposit offered the product, and not, as testified to by the defendants, "forever". See, e.g., Trial Transcript, 4/1/96 at 32–33 & 82; Plaintiff's Exhibit No. 5 (Brochure, which reads: "The rate of interest changes on the first business day of the month, however, the customer is guaranteed that the rate of interest will not go below 10% *as long as* Dauphin Deposit offers an 18 month variable rate account.").

Accordingly, after reviewing the trial transcripts and the law applicable to class settlements, it would appear that the court's decision to disapprove settlement and continue the trial to "permit the defendants to prevail by the application of the most elementary of contract principles" was error. See *Buchanan,* 259 Pa.Super. at 49, 393 A.2d at 710 ("the lower court[']s deci[sion] that the plaintiffs 'have potentially a good cause of action' . . . was error" and, as a result, the refusal to

---

**2.** A review of the four days of trial testimony discloses that, of the fifteen witnesses presented upon behalf of the defendants, each witness admitted receiving some, if not all, of the literature dispensed by the plaintiff's (see Exhibits 1, 2, 3, 5 & 6) to prospective account holders revealing that the 18–month variable rate account would remain in existence *as long as* the Bank offered

the product. See Trial Transcript, 4/4/96 at 13, 36–38, 40, 55, 73, 79–81, 84, 90, 102, 107, 116, 128, 138, 147, 162, 174 & 184.

**3.** See Plaintiff's Exhibits 1 (Custodial Agreement), 2 (Disclosure Statement), 3 (Appendix A), 5 (Brochure) and 6 (IRA Kit).

approve settlement was manifestly unreasonable).

■ Also of importance, but labelled de minimis by the court, is the disproportionate number of objectors (89) to the proposed settlement in the class of 4,315 members.[4] Notices were sent to all interested parties and time limits were set for the receipt of objections. The court makes much of the *objectors' account* of why more than 89 in number failed to take formal action to contest the proposed settlement, e.g., lack of legal education impaired understanding of the terms and conditions of the settlement and prospects of initiating independent litigation if settlement not accepted restrained potential objectors. See *Fischer,* supra (Relevant to approving proposed settlement that only 14 of a class of approximately 1,000 members chose to object).

We find unpersuasive and improper *reliance upon the comments of the objectors* at the June 21, 1996, hearing to approve settlement as pure hearsay as to why other members of the class failed to come forward to voice their complaints. The class members were represented by experienced and competent counsel ready, willing and able to discuss with class member questions concerning any facet of the litigation. The protestations that the content of the notices of settlement were incomprehensible (even after receiving approval by the court for distribution), when the class had counsel available to inform and advise if asked, rings hollow.

Inhibitions to act, be they fanciful or real, have not been demonstrated to this Court to be the product of a substantial and genuine percentage of the class members to assign any weight to the complaints proffered by the 89 objectors *on behalf of the absentee purported silent majority,* the reasons for which even the court observed were "known only to the persons involved". We may not speculate as to their absence nor will we assign any credence to those who wished to speak (and object) in their stead.

Lastly, we wish to note that the court never attempted to establish a "range of reasonableness" in light of the attendant risks of litigation. In actuality, the court appeared to review the case as if it had granted summary judgment for the defendants on the liability issue, a posture which was inappropriate to the court's decision-making role. *Buchanan,* supra.

■ In deciding whether the settlement falls within a "range of reasonableness," we need to examine whether the proposed settlement secures an "adequate" (and not necessarily the best possible) advantage for the class in exchange for the surrender of the members' litigation rights. At bar, the class was divided into two groups: Class A and Class B, the former of which would be the recipient of a rate of interest set at 10% for ten years upon presentment of proof (either written or oral) to buttress their claim that the account was "automatically renewable" at their discretion until they terminated it. Class B included those members who had no evidence of the longevity of the account, which entitled them to a 10–year rate of return of 7%.[5]

■ Here, it is beyond cavil that competent counsel engaged in extended negotiations to settle a protracted lawsuit that was vigorously disputed. And, financial experts from all fields of endeavor were consulted concerning the investment arena and the role of the IRA as an investment tool. See Trial Transcript, 6/21/96. In this light, a court need not inquire into whether the "best possible" recovery has been achieved. Rather, in view of the stage of the proceedings, complexity, expense and likely duration of further litigation, as well as the risks of litigation, the court is to decide whether the settlement is reasonable. *Wilson v. State*

---

4. At oral argument, this Court requested the parties to submit post-appeal communications regarding the value of the accounts of the 89 objectors. From the information which we have received, this figure is either in dispute or not ascertainable. In any event, our final disposition is not altered by such a void in the record.

5. The present rate of return offered by National City Bank on an 18–month variable rate certificate of deposit, with a minimum deposit of $1,000, is 5.16% with an annual percentage yield of 5.30%. The class members' receipt of a 10% and 7% rate of return for ten years under the proposed settlement would appear to be within the "range of reasonableness". *Buchanan,* supra.

*Farm Mutual Ins. Co.*, 512 Pa. 486, 517 A.2d 944, 948 (1986).

In the best of all possible worlds, the ideal result would be as the objectors perceive it to be—10% for life. However, the element of uncertainty inherent in any compromise exists when a judicial outcome is foregone for the certainty of settlement. *Buchanan,* supra; *In re GMC Pick–Up Truck Fuel Tank Products Liability Litigation,* 55 F.3d 768, 806 (3rd Cir.1995). Further, we find the relaxed criteria recommended by both counsel in creating Class A and Class B does not smack of discrimination, but is a realistic cutoff point and limitation to exposure to liability.

Based on the preceding, we hold that the court's decision to refuse the settlement was manifestly unreasonable.[6] We will, therefore, reverse the court's order and direct the acceptance of the proposed settlement without the need of taking additional testimony as fair, reasonable and in the best interests of all concerned and avoids further delay and expense to the parties. *Buchanan,* supra.

Order reversed and case remanded for compliance with this opinion.

HESTER, J., files a dissenting statement.

HESTER, Judge, dissenting:

I respectfully dissent. I would affirm on the exceptionally well-reasoned opinion of the trial judge, the Honorable Kevin A. Hess.

---

6. Our discussion of some of the points in support of the court's order is not to be viewed as ignoring, without discussion, the other factors referenced in its opinion. We have reviewed each and find none, either individually or in concert, justifies a refusal to approve settlement.